PEOPLE v YARBOUGH

Docket No. 78718. Submitted April 4, 1985, at Grand Rapids.—Decided January 6, 1986. Leave to appeal applied for.

Defendant, Ethel Mae Yarbough, was bound over on a statutory short-form information alleging a charge of open manslaughter. She was convicted of involuntary manslaughter, Allegan Circuit Court, George R. Corsiglia, J. Defendant appealed. *Held:*

1. The evidence was sufficient to support the determination of the trier of fact that defendant was guilty beyond a reasonable doubt.

2. The court had jurisdiction of the charge and defendant had adequate notice that she would have to defend against involuntary manslaughter.

3. Defendant's sentence of incarceration, while placing a burden on her religious conduct, was justified by the compelling state interest of the protection of children.

4. The court erred in scoring Offense Variable 9 under the Sentencing Guidelines. However, the single point difference did not require a remand for resentencing, since it did not affect the minimum sentence range and the Court of Appeals believed that the sentence was based on accurate information and reflected a proper exercise of discretion.

Affirmed and the sentence information report corrected to reflect one point for Offense Variable 9 and eight points total.

MacKenzie, P.J., concurred in all but the majority's analysis of the scoring under the Sentencing Guidelines. She believed that the trial court's scoring of Offense Variable 9 involved a conclusion based on undisputed facts and, that being the case, the Court of Appeals should not engage in second-guessing.

OPINION OF THE COURT

1. INDICTMENT AND INFORMATION — MANSLAUGHTER BY ASSAULT — INVOLUNTARY MANSLAUGHTER — SHORT-FORM INFORMATION.
   Manslaughter by assault may be charged under the statutory

REFERENCES
Am Jur 2d, Criminal Law §§ 588 *et seq.*
Am Jur 2d, Homicide § 207.
See the annotations in the ALR3d/4th Quick Index under Homicide.

short-form information and may constitute involuntary manslaughter, because the statutes of this state neither recognize nor define grades or degrees of manslaughter.

2. CRIMINAL LAW — SENTENCING — FIRST AMENDMENT RIGHTS.

A sentence may interfere with a defendant's First Amendment right to free exercise of religion where a compelling state interest justifies the burden.

CONCURRENCE BY MACKENZIE, P.J.

3. CRIMINAL LAW — SENTENCING GUIDELINES — APPEAL.

*The Court of Appeals, in reviewing the scoring decisions which the trial court must make to arrive at a Michigan Sentencing Guidelines' recommended sentence, should not get bogged down in second-guessing the trial judge's mechanics in scoring the sentencing guidelines; the underlying factual findings which the sentencing judge may have to make must be upheld if there is any evidence to support them.*

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Fred R. Hunter, III,* Prosecuting Attorney, and *Jann Ryan Baugh,* Assistant Attoreny General, for the people.

State Appellate Defender (by *Susan J. Smith),* for defendant on appeal.

Before: MACKENZIE, P.J., and CYNAR and WAHLS, JJ.

WAHLS, J. Defendant was tried before the bench on a charge of open manslaughter, MCL 750.321; MSA 28.553. She was convicted of involuntary manslaughter and sentenced to imprisonment for from 4 to 15 years. She appeals as of right. We affirm.

The charge against defendant arose out of the beating death of her 12-year-old son John at the House of Judah Camp in Allegan County. About three years before his death, John came to live with his mother and five siblings at the camp, after being raised by his grandmother. John did

not fit in with life at the camp and apparently was often rebellious and disobedient.

On Wednesday, June 29, 1983, John was a member of a work detail that was cleaning up the grounds around the camp. After a lunch break, John was tardy in returning to the detail and refused to continue working. Larry Branson, Theodore Jones and Eddie Green, all grown men, then dragged John to the whipping block to immobilize his hands and feet. John, at 5′3″ and 120 lbs., showed considerable strength in resisting his "chastisement", so Branson and Green helped restrain him while Jones delivered 30 blows to his backside with a tree limb approximately four feet long and an inch to an inch and a half in diameter. While the blows were intended for John's buttocks, because he was twisting and turning, some of them may have landed elsewhere on his body. The three men did not get permission from either defendant or the camp leader, Prophet William A. Lewis, to impose the chastisement on John.[1]

In the days following the beating, John refused to eat and suffered episodes of vomiting, involuntary bowel movements and stumbling and falling down. Defendant and other camp personnel allegedly did not view his behavior as signs of sickness or injury but of further intentional acts of rebellion. Apparently, John had exhibited similar behavior in the past when he wanted to return to his grandmother's. However, following the Wednesday beating, even a casual observer could readily have observed abrasions and bruises on John's head, neck and arms.

---

[1] Branson and Jones were convicted of child cruelty, MCL 750.136; MSA 28.331, on their pleas of nolo contendere. *People v Branson,* 138 Mich App 455; 360 NW2d 614 (1984). Green was granted immunity from prosecution.

On Saturday, July 2, 1983, John suffered a vomiting episode while sitting on a swing during a religious meeting. Branson, Jones and some other men, including the Prophet, took John into the gymnasium to change his clothes. Antwyne Anderson testified that John was stumbling and falling down and that the Prophet hit John once or twice on the legs. Mrs. Celia Green, Eddie's wife, testified that she saw Jones hit John in the head with his fist and either Branson or Jones hit John on the back with a stick.[2] Branson and Jones denied hitting John.

On Sunday, July 3, 1983, about 6 p.m., defendant wanted John to go outside and walk around to exercise his muscles, which she believed were stiff from his Wednesday chastisement. When John balked, defendant hit him with a stick approximately 18 inches long and an inch to 2 inches in diameter. As John exited from the house trailer, he fell down the stairs and was unable to get back inside by himself. Defendant dragged him in. John went to bed sometime after 9 p.m. About 4 a.m., on July 4, defendant checked on John and discovered he was not breathing. Help was summoned from camp personnel and the Prophet instructed that, as a last resort, John be taken to the hospital. He was pronounced dead on arrival.

The deputy county medical examiner and several others went to the camp to investigate John's death following a visual examination of the body. Defendant admitted hitting John on July 3, and stated that she had "tore up his bottom pretty good".

The medical testimony indicated that John died about 1 a.m. Examination revealed massive hematomas on the buttocks, with partially healed abra-

---

[2] Mrs. Green was the last witness called by defendant and was one about whom the defense learned only that day.

sions with scabs. These injuries were determined to be several days to a week old and were consistent with the Wednesday beating. Fresh hematomas with corresponding trauma caused by a blunt object, such as a broom handle, were found on John's buttocks, lower back and upper back. These newer injuries resulted in brain edema, kidney, heart and pulmonary failure, which, in conjunction with internal hemmorrhage, were apparently the cause of death.

The circuit court judge found that the fresh injuries were inflicted by defendant and that she must reasonably have known that John was already seriously hurt. The judge rejected Mrs. Green's testimony that Branson or Jones had struck John on July 2; the judge believed Branson and Jones because they had already pled nolo contendere to child cruelty and hence would have no reason to falsify their testimony. The judge rejected the ideas that defendant had only tapped John with a stick and that she would have been unable to inflict serious injury because she was John's size and about seven months pregnant. The judge believed that defendant's statement that she "tore up [John's] bottom pretty good" was evidence that she hit him with considerable force.

Defendant argues on appeal that the evidence was insufficient to prove that defendant beat John severely on July 3, 1983, and that this beating was the proximate cause of John's death. We disagree. We find no clear error and are convinced that a trier of fact could reasonably conclude that defendant was guilty beyond a reasonable doubt. *People v Triplett,* 105 Mich App 182, 190-191; 306 NW2d 442 (1981), *remanded* 414 Mich 898 (1982).

Defendant also argues that her conviction of involuntary manslaughter must be reversed because the circuit court never acquired jurisdiction

over this offense and because defendant did not have adequate notice that she would have to defend against it. We disagree. At the preliminary examination, trial counsel for defendant stated that he was aware that the prosecutor had available "at least two theories of either voluntary or involuntary manslaughter". Counsel argued that the evidence did not support a bindover on either theory. The prosecutor responded, addressing the examining magistrate: "We would say that we have proof of the voluntary manslaughter as well as involuntary manslaughter and we'd ask you to bind her over on an open count of manslaughter." Subsequently, in reviewing the intent element for manslaughter, the magistrate spoke only in terms of voluntary manslaughter. Nevertheless, we are not convinced that the magistrate intended to foreclose an involuntary manslaughter charge. He bound defendant over on the statutory short-form charge, which was sufficient to give the circuit court jurisdiction of both forms of manslaughter since this case involves a charge of death by assault. *People v Myers,* 30 Mich App 409, 426-427; 186 NW2d 381 (1971). We find defendant was on adequate notice of the need to defend against an involuntary manslaughter charge. *People v Barnwell,* 60 Mich App 291; 230 NW2d 400 (1975).

Defendant next challenges her sentence, arguing that the circuit court's reliance on her continuing affiliation with and residence at the House of Judah in imposing a lengthy prison sentence violated her rights to due process and the free exercise of religion. We cannot agree with defendant's position that the court was penalizing her for exercising her right to the free exercise of religion. The court saw a "defect" in defendant with respect to excessive discipline of her children and viewed defendant's immediate return to the camp envi-

ronment, with its "lack of leadership and control", and "improper, at least for the children". Incarceration was imposed, not to change defendant's religious beliefs, but to make defendant realize that discipline to the extent of breaking the skin and causing scarring and massive bruising is inappropriate and "far beyond what's tolerated in any decent society". While defendant's separation from other members of the House of Judah does place a burden on her religious conduct, the protection of her other children is a compelling state interest which justifies the burden. *People v Branson,* 138 Mich App 455; 360 NW2d 614 (1984); *Sheridan Road Baptist Church v Dep't of Education,* 132 Mich App 1; 348 NW2d 263 (1984), *lv granted* 422 Mich 857 (1985).

Defendant raises an additional challenge to her sentence on the basis that, in applying the sentencing guidelines, the court incorrectly scored several offense severity variables. The court scored one point for offense variable three (O.V.3), regarding defendant's intent. This score is not challenged. The court scored three points for O.V.4, finding aggravated physical injury. The guidelines do not define "aggravated physical injury" and defendant argues that the phrase should mean "acts above and beyond those which resulted in death and which were designed to inflict special terror or suffering on the victim". Defendant suggests that such a definition is required because all homicides obviously involve an aggravated physical injury. We cannot agree. First, as defendant acknowledges, her definition might mean that the factor of aggravated physical abuse is never appropriate in involuntary manslaughter cases. We doubt that the factor was intended to have such a result. Second, defendant's definition blurs the distinction between aggravated physical injury and

"torture or sadism", for which five points are scored. Third, we find it helpful to compare the use of the term "aggravated" under O.V.20 of negligent homicide. There, "highly aggravated" is used to refer to driving in a reckless or negligent manner beyond that required for a negligent homicide conviction. O.V.4 of homicide does not make the distinction between "highly aggravated" and "not highly aggravated", so we assume that "aggravated personal injury" may be found where the defendant's acts may or may not be beyond what is required to prove the homicide. In any event, the evidence at trial indicates that defendant struck John on the buttocks with sufficient force to cause bleeding and bruising, in addition to the blows to his lower and upper back which caused the injuries resulting in his death. Therefore, we hold that three points were properly scored for O.V.4.

The court scored three points for O.V.7, regarding the offender's exploitation of the victim's vulnerability. Defendant argues that there is no evidence that defendant manipulated John "for selfish or unethical purposes" in accordance with the definition of exploitation given in the guidelines. We disagree. The lower court found vulnerability based on John's physical disability and youth and on defendant's abuse of her authority status. Although the court did not discuss defendant's purpose in beating John as severely as she did, it is readily inferable from the evidence that defendant acted at least partly out of selfish motivation, *e.g.,* to preserve her authority status in the face of a rebellious son, to vent frustration at his continued disobedience or to insure her place in heaven by chastising her son in accordance with the dictates of her religion. Accordingly, we find no clear error.

Thus far, we find that defendant was legitimately given seven offense severity points. These points alone would put her in the third and highest offense severity level. However, defendant was also given two points under O.V.9 as an active participant in a multiple offender situation. Defendant contends that she should not have received more than one point as a lone offender. The lower court gave the two points on the basis that defendant "acted in concert with others [because] she knew that other members of the Sect had administered discipline". The court further reasoned that, based on the marks on John's body, defendant must have known that he had been severely disciplined and yet she failed to determine the nature and extent of the discipline. We are not persuaded that the "concerted" action the court described makes defendant "an active participant in [a] multiple offender situation". Defendant was not a participant in the events of Wednesday and Saturday, nor were the men of the camp participants in the Sunday beating by defendant. The fact that discipline was so much a part of camp life and the religious beliefs of the House of Judah does however, we admit, make this a close question.

While we are convinced that the court erred in scoring two points for O.V.9, we find no reason to remand for resentencing. The difference of one point does not affect the minimum sentence range. Nor do we believe that it can have any effect on the length of sentence imposed in this case. Viewing defendant as acting alone under O.V.9 affects neither the truth of the court's statement that she shirked her duty as a parent nor the validity of that statement as a reason for imposing sentence even apart from the guidelines. We believe the sentence was based on accurate information and reflected a proper exercise of the court's discretion.

*Cf. People v Love,* 144 Mich App 374; 375 NW2d 752 (1985); *People v Benson,* 142 Mich App 720; 370 NW2d 16 (1985).

The sentence information report should be corrected to reflect one pont for O.V.9 and eight points for the O.V. total.

Affirmed.

CYNAR, J., concurred.

MACKENZIE, P.J. *(concurring).* I concur in the majority opinion except as to the analysis relating to the sentencing guidelines. I write separately to register my concern that, by undertaking an extended analysis of defendant's claim that the sentencing guidelines' offense variables were improperly applied, the majority is potentially usurping the discretionary role of the trial court in imposing sentence. I do not believe that this Court should engage in attempts to either mandate or second-guess the manner in which the trial court applies the sentencing guideline variables unless the record discloses that the judge based his or her assessment of those variables on clearly erroneous facts.

In *People v Benson,* 142 Mich App 720, 722-723; 370 NW2d 16 (1985), a panel of this Court observed:

"The trial court based its assessment [of the disputed offense variable] upon admissions of the defendant contained in the presentence report. At sentencing the trial court allowed both defendant and his attorney the opportunity to dispute, explain and clarify the facts underlying this point allocation. The facts upon which the judge based his decision were not challenged so much as were the conclusions he drew from those basically undisputed facts. Under such circumstances, we find no basis for this Court to interfere with the

trial court's discretionary assessment. Thus, four points were properly awarded under [the disputed offense variable]."

In *People v Thomason,* 141 Mich App 578, 580; 367 NW2d 364 (1985), the majority of another panel of this Court stated:

"Defendant now contends that the trial court abused its discretion by assigning the wrong number of points for Offense Variable 2 under the robbery heading. While we can see from the record that there was a difference of opinion between defense counsel and the court about the proper number of points to be assigned, we decline to pass on that question. The only issue before us is the question of whether the trial court abused its discretion in fashioning defendant's sentence".

In *People v Clark,* 147 Mich App 237, 243; 382 NW2d 759 (1985), yet another panel held:

"[T]his Court will not get bogged down in second-guessing the detailed calculations under the sentencing guidelines. In the overwhelming majority of cases, review of the sentencing guideline calculation should be perfunctory. Only in the very extreme case should there be any appellate review. Since here the trial judge had adequate evidence to score defendant as he did under the sentencing guidelines, resentencing of defendant is unnecessary."

In the instant case, each of defendant's claims regarding the court's scoring of the offense variables challenges the conclusions the judge drew in applying the facts of the case to the sentencing guidelines. The scoring of the offense variables is not alleged to have been based on factual inaccuracies, but rather on a disagreement with the conclusions reached from essentially undisputed facts.

Under these circumstances, we ought not interfere with the court's discretionary assessment.

The sentencing guidelines are meant to serve as a tool to aid trial judges in the exercise of discretion in sentencing convicted felons. This Court is not in the business of imposing sentences; this Court should not be in the business of modifying sentencing information reports. In my opinion, we should not substitute our opinion for that of the sentencing court where the facts support the judge's assessment of the guidelines variables.